STATE OF CONNECTICUT *v.* JAMES MITCHELL
(AC 28998)

Flynn, C. J., and Harper and Beach, Js.

306

Argued April 28—officially released September 16, 2008

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Harry Weller*, senior assistant state's attorney, with whom were *Gail P. Hardy*, state's attorney, and *Sandra L. Tullius*, senior assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, James Mitchell, appeals from the judgment of conviction, rendered after a jury

trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 (a), 53a-8 and 53a-54a, conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a, kidnapping in the first degree in violation of General Statutes §§ 53a-8 and 53a-92 (a) (2) (A), conspiracy to commit kidnapping in the first degree in violation of General Statutes §§ 53a-48 and 53a-92 (a) (2) (A), sexual assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-70 (a) (1), conspiracy to commit sexual assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-70 (a) (1), assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-59 (a) (5), conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-59 (a) (5), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). On appeal, the defendant claims that (1) the trial court, sua sponte, should have declared a mistrial after witnesses for the state testified about the defendant's criminal history and prior arrests, (2) the prosecutor engaged in impropriety, (3) the court improperly admitted into evidence a letter written by the defendant discussing escape plans and (4) the court improperly instructed the jury as to accessory liability. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On August 23, 2003, following an evening at a nightclub, the victim[1] was dropped off at a friend's house in East Hartford. Wanting to return home, and with her residence too distant to walk, the victim called the defendant for a ride. The victim chose to call the defendant because she knew that Denasha Sanders, the mother of one of the defendant's children, had lived in the same building as the victim and that the defendant

---

[1] In accordance with our policy of protecting the privacy interests of victims of sexual abuse, we do not identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

was frequently in the vicinity. The defendant and the victim's brother had had a prior confrontation concerning the fact that the victim's brother had dated Sanders. Shortly before August 23, the victim's brother and Sanders had moved to North Carolina with the child of Sanders and the defendant.

The defendant arrived driving a gold Nissan Altima accompanied by another man, unknown to the victim at the time, but later identified as Travis Hampton. The victim agreed to go with the defendant and Hampton to downtown Hartford to get something to eat. Upon leaving a restaurant, the defendant became violent with the victim, striking her with his cell phone and demanding to know the location of the victim's brother. Out of fear that the defendant would harm her, the victim lied to the defendant and told him that her brother was at her grandfather's house. The victim attempted to leave the car, but the defendant pulled her by the hair and locked the doors. During this time, Hampton remained in the backseat of the vehicle.

The defendant subsequently determined that the victim's brother was not at her grandfather's house. He drove the victim and Hampton to his mother's house in Hartford and ordered the victim out of the car. The victim briefly complied and then returned to the vehicle while the defendant and Hampton entered the house. When the defendant and Hampton returned, the three proceeded to leave the area by car. The defendant apologized to the victim for hitting her and offered her marijuana, which she accepted. Instead of driving the victim home, however, the defendant drove to Market Street in Hartford and parked his vehicle. The defendant told the victim he wanted to have sex with her and proposed that they go to a hotel or to Sanders' house.

The victim refused and got out of the car, intending to walk home. The defendant produced a shotgun,

which he gave to Hampton, who pointed the weapon at the victim's face. The defendant and Hampton told the victim to remove her pants. The victim testified that the defendant raped her vaginally from behind. When the defendant was finished, he forced the victim to perform fellatio on Hampton. The victim complied briefly, and Hampton proceeded to rape her vaginally, while the defendant regained and held the shotgun. The victim grabbed her pants and yelled at the defendant to let her leave. The defendant told the victim she could get into a nearby dumpster or run. As the victim attempted to run, the defendant shot her in the side of the stomach. The victim continued her attempt to run away, followed by Hampton, who now had the shotgun. The defendant pursued the victim in the car and blocked her path. Hampton shot the victim again. He and the defendant then left the scene. Shortly thereafter, the defendant and Hampton returned briefly and then left the area again. The victim dragged herself to the street, where she was found by a passing driver. The police and paramedics were summoned, and the victim was taken to Hartford Hospital for treatment.

The defendant thereafter was arrested and, by amended information, charged with attempt to commit murder, conspiracy to commit murder, kidnapping in the first degree, conspiracy to commit kidnapping in the first degree, sexual assault in the first degree, conspiracy to commit sexual assault in the first degree, assault in the first degree, conspiracy to commit assault in the first degree and criminal possession of a firearm. The jury found the defendant guilty on all counts. The court imposed a total effective sentence of fifty-seven years imprisonment. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court, sua sponte, should have declared a mistrial following certain testimony as to his prior bad acts. The defendant argues

that this testimony unduly prejudiced him, thereby interfering with his right to a fair trial. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. During cross-examination of the victim, defense counsel inquired as to why the victim had called the defendant in the early morning hours of August 23, 2003. The victim responded: "For a ride, because I know he was—he used to sell crack in front of my mother's building. And he would be out there at that time of night." The defendant objected, requesting the court to strike the victim's response. The court struck the testimony and instructed the jury to disregard it.

The state called William Rivera, a detective with the Hartford police department. In August, 2003, Rivera had been a patrol officer serving in the department's community response division. In response to the prosecutor's question as to how he knew the defendant, Rivera stated: "He primarily frequented the area that I worked in. There were times when we stop and have conversations. I've also arrested him in a narcotics related arrest." The defendant did not object. On cross-examination, defense counsel inquired further into Rivera's relationship to the defendant. When defense counsel asked when Rivera first met the defendant, Rivera answered: "Within that past year [prior to August, 2003]. There were different—different interactions with him. I made a narcotics arrest on him." Defense counsel did not object but continued with his line of questioning, asking Rivera how the defendant had acquired Rivera's cell phone number. Rivera responded: "Well, during the narcotics arrest I made on him, he wanted to help himself in the case. So, usually when police officers have informants that want to help themselves out, they'll give the phone number just to get in contact with him." Defense counsel immediately asked Rivera: "So, because he had a pending

case, he was cooperating with you in the role of an informant?" Rivera answered affirmatively.

Following the conclusion of the state's redirect examination of Rivera, and outside the presence of the jury, the court noted Rivera's testimony as to the defendant's prior arrest and asked the defendant whether he wanted a curative instruction. Counsel for the defendant declined the offer, indicating a desire not to emphasize Rivera's testimony.

The state also called as a witness Alfred Henderson, a detective with the major crimes division of the Hartford police department and the lead detective in the case. Henderson testified as to the following facts pertaining to how the police gathered the information that led ultimately to their identification of the defendant as a suspect. The victim provided police detectives with the defendant's first name and indicated that the defendant had had a "prior incident" in East Hartford with Sanders. The detectives searched the East Harford police computers, gaining information concerning a domestic dispute between the defendant and Sanders. The detectives proceeded to the Hartford police department, where they obtained a photograph of the defendant. The photograph was arranged in an eight person photographic array, from which the victim identified the defendant. Defense counsel raised no objection during this portion of Henderson's testimony.

The prosecutor asked Henderson how, subsequent to the victim's identification, the police attempted to locate the defendant. Henderson responded: "Well, we punched up his past criminal history in our computers and we get several . . . ." The court interrupted Henderson at this point, and the prosecutor asked the court to strike the testimony. The court struck Henderson's remark and instructed the jury to disregard it. The defendant made no objection.

The defendant acknowledges that, with the exception of the victim's statement, he raised no objection to the testimony in question at trial and, thus, failed to preserve his claims. He therefore seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id. Because we conclude that the defendant has neither demonstrated that a constitutional violation clearly exists nor that he was deprived of a fair trial, his claim fails under the third prong of *Golding*.

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision

whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Ortiz,* 280 Conn. 686, 702, 911 A.2d 1055 (2006).

In the present case, both the victim's statement that the defendant formerly had sold drugs in the area of her mother's house and Henderson's second statement pertaining to the police detectives' accessing the defendant's criminal history in police computers to locate the defendant, drew immediate objection and promptly were stricken by the court. Further, the court on its own initiative instructed the jury to disregard each statement, both at the time the testimony occurred and as part of the court's final jury instruction. A jury is presumed to follow the court's instructions, absent clear indication to the contrary. *State* v. *Booth,* 250 Conn. 611, 626, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut,* 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). Nothing in the record indicates that the jury failed to follow the instruction.

Rivera's initial remark, referencing the fact that he previously had made a narcotics related arrest of the defendant, occurred during the state's direct examination. The defendant not only failed to object to this testimony, but he pursued a line of questioning that elicited the same information two times. Again, the defendant did not object to Rivera's additional references to the defendant's previous arrests. Rather, the record reflects defense counsel's attempt to use Rivera's testimony to demonstrate the defendant's willingness to cooperate with the police, an explanatory theory that the defendant advanced throughout the trial.

Most importantly, the defendant declined the court's offer of a curative instruction regarding Rivera's testimony. In declining the instruction, the defendant made

a legitimate tactical decision not to emphasize the testimony.[2] This court will not second-guess such decisions on appeal. See *State* v. *Ruffin*, 48 Conn. App. 504, 509–10, 710 A.2d 1381, cert. denied, 245 Conn. 910, 718 A.2d 18 (1998).

The remaining challenged testimony is Henderson's statements that the victim had indicated that the defendant had had a "prior incident" with Sanders and that the police had used this information to determine the defendant's identity by accessing the East Hartford police computers. Once again, we note the defendant's failure to raise an objection at trial to Henderson's testimony or to the prosecutor's line of questioning during which it occurred. Further, the court's charge instructed the jury that the court had taken judicial notice of the fact that the defendant had no domestic violence convictions and no felony convictions other than that to which the defendant had stipulated and later testified.[3]

Having thoroughly reviewed the record in this case, we cannot conclude that it was apparent to the court that the challenged testimony of the victim, Rivera and Henderson deprived the defendant of a fair trial. It certainly was not apparent to the defendant, who neither objected to any of the testimony other than the victim's, nor moved for a mistrial. See *State* v. *Cooper*, 227 Conn.

[2] In his appellate brief, the defendant claims that in declining the court's offer of an instruction during the trial, defense counsel indicated that the defendant would wait for a final jury instruction regarding Rivera's testimony, "but one was never given." When the court asked defense counsel whether she would accept the court's offer of an instruction, defense counsel responded: "Your Honor, we don't want to emphasize it. So, we'll just maybe wait till the end if we—we don't want you . . . ." The court indicated the decision was a reasonable tactical position. The defendant did not request a further jury instruction regarding Rivera's testimony, and he took no exception to its absence from the court's final instructions to the jury.

[3] The parties stipulated to the fact that the defendant had been convicted of an unspecified felony in September, 1997. The defendant later testified on direct examination that the felony was a robbery.

417, 442, 630 A.2d 1043 (1993); *State* v. *Jaynes*, 35 Conn. App. 541, 561, 645 A.2d 1060, cert. denied, 231 Conn. 928, 648 A.2d 880 (1994). The record indicates that the court took its duty to ensure a fair trial very seriously by advising the jury to disregard the testimony concerning the defendant's criminal history found in police records. The court did not abuse its discretion in not ordering a mistrial sua sponte.

The defendant also seeks review of his claim under the plain error doctrine. "It is . . . well established that plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *Jackson*, 73 Conn. App. 338, 386, 808 A.2d 388, cert. denied, 262 Conn. 929, 814 A.2d 381 (2002). Having concluded that the defendant was not deprived of a fair trial when the court did not sua sponte declare a mistrial, we also conclude that plain error review is not warranted here.

II

The defendant next claims that the prosecutor engaged in impropriety denying the defendant his right to a fair trial. Specifically, the defendant contends that the prosecutor's questions during cross-examination of defense witnesses Sanders, the defendant's mother and the defendant himself unfairly and prejudicially portrayed the defendant as violent and abusive. Although we agree that the prosecutor in this case committed impropriety in mentioning certain specifics of the defendant's prior felony conviction, we conclude that the defendant was not thereby denied a fair trial.

The following additional facts are necessary for our resolution of the defendant's claim. On direct examination of Sanders, the defendant inquired as to whether the witness had spoken with Henderson. Sanders testified that Henderson had asked her whether the defendant had been abusive or threatening and that she had responded that he had not. During cross-examination of Sanders, the prosecutor asked her about police reports she had made concerning the defendant, including one incident in which the defendant allegedly grabbed her by the throat and put her against a wall and another in which he allegedly threatened to take Sanders' child. Sanders admitted that she had telephoned the police with regard to the defendant and that the defendant had threatened to take her child. Sanders disputed the seriousness of the incident in which the defendant allegedly put her against the wall, describing it simply as an argument. In addition, the prosecutor inquired whether the victim's brother and the defendant had had disputes over Sanders' and the defendant's child, and, on one occasion, the prosecutor asked Sanders whether she understood that she was testifying under oath.

The defendant's mother, Judith Williams, testified on behalf of the defendant. Defense counsel asked Williams what kind of man the defendant was. Williams indicated that the defendant was an attentive, responsible man. On cross-examination, the prosecutor asked Williams whether she knew that the defendant had been convicted of a felony. The prosecutor then repeatedly asked whether Williams was aware that the felony in question included a firearm.[4] The prosecutor also asked

---

[4] The relevant portion of Williams' testimony is as follows:

"[The Prosecutor]: Miss Williams, you're aware that in September of 1997 your son was convicted of a felony. Correct?

"[The Witness]: His juvenile?

"[The Prosecutor]: No, not his juvenile. When he was in adult court here in Hartford.

"[The Witness]: I know about his last conviction, yes.

Williams if she knew about Sanders' police reports concerning the defendant.

Prior to Williams' testimony, and outside the presence of the jury, the court discussed a stipulation between the prosecution and the defense regarding the defendant's prior conviction for armed robbery.[5] The court indicated its desire that the stipulation not mention the specific nature of the defendant's crime and that it convey only the fact that the defendant had been convicted of a felony. When the jury returned to the courtroom, the court informed the jury of the stipulation and the purposes for which the jury could employ it.[6]

On direct examination, the defendant testified about two incidents involving his having threatened to take

"[The Prosecutor]: And that was for robbery in the first degree with a gun. Isn't that right?

"[The Witness]: No, I don't believe it was.

"[The Prosecutor]: You don't remember that?

"[The Witness]: I remembered the case, but I do believe that the gun charge was dropped.

"[The Prosecutor]: The gun charge was dropped, but he was convicted of the robbery in the first degree. Do you know that that was based on him having a gun?

"[The Witness]: No. That's not what I was told.

"[The Prosecutor]: You were aware that that was the allegation, though: that he had been involved in a robbery of an individual and that he had used a gun?

"[The Witness]: No. I was told that someone else had used a gun, and the gun was placed in his possession. But he would not tell who the gun belonged to, so they pinned the charge on him.

"[The Prosecutor]: And that's—

"[The Witness]: That's what I was told.

"[The Prosecutor]: That's the version that [the defendant] gave to you. Correct?

"[The Witness]: No. I was told by the public defender.

"[The Prosecutor]: All right."

[5] The stipulation pertained directly to the ninth count of the indictment, criminal possession of a firearm, pursuant to § 53a-217 (a) (1).

[6] The final stipulation stated only that the defendant "was convicted of a felony, to wit, a crime having a potential penalty of more than one year of incarceration."

his child from Sanders. In each instance, the defendant testified that he had acted out of concern for the child's safety and that the incidents were resolved peacefully. While cross-examining the defendant, the prosecutor returned to the subject of Sanders' police reports, asking whether one particular incident had led to the defendant's arrest. In addition, the prosecutor inquired whether the defendant's behavior may have led Sanders to fear the defendant.

"In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 760, 931 A.2d 198 (2007).

At trial, the defendant failed to object to the alleged instances of prosecutorial impropriety that he raises on appeal. His claims therefore are unpreserved. In such instances, "it is unnecessary for the defendant to seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the

defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by [the Supreme Court] in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As [the court] stated in that case: 'In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case.' " *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004).

We conclude that the prosecutor's questioning of Sanders and the defendant was not improper. The defendant invited discussion of his relationship with Sanders, including the particular incidents underlying Sanders' police reports, through Sanders' testimony that the defendant never had been abusive to her and his testimony regarding the incidents concerning their child. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence. . . . [T]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing

the prosecution to place the evidence in its proper context." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 822, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). The prosecutor's lone remark to Sanders regarding her testimonial oath was not sufficient to convey to the jury that the prosecutor did not believe the witness and, therefore, is not sufficient to support a finding of impropriety.

We conclude, however, that the prosecutor's questioning of Williams in part was improper. Williams' direct testimony as to the defendant's character allowed the state to test the basis of her opinion. See *State* v. *Shehadeh*, 52 Conn. App. 46, 49, 725 A.2d 394 (1999). However, the prosecutor's explicit references to the fact that the defendant had been convicted of robbery and that a firearm had been involved were contrary to the parties' stipulation,[7] which referenced only a general felony conviction. The court's discussion of the stipulation made clear its desire that the exact nature of the defendant's felony conviction not be disclosed to the jury so as to avoid potential prejudice to the defendant. Further, the jury had obtained knowledge of the stipulation prior to Williams' testimony.

Having determined that the prosecutor's reference to the nature of the defendant's felony conviction was improper, we must apply the factors set forth in *State* v. *Williams*, supra, 204 Conn. 540, to decide whether such impropriety deprived the defendant of his right to a fair trial. As an initial matter, the prosecutor's references were not invited by the defendant. Second, because the references to the nature of the felony went beyond a stipulation that the court had strongly suggested and then approved, we conclude that the severity

---

[7] See footnote 3.

line was crossed. Third, the impropriety was not frequent. Although the prosecutor referenced the fact that the defendant's felony conviction involved a firearm three times, the questioning was limited to a brief portion of Williams' overall testimony. The improper references came in the course of the state's proper investigation of Williams' knowledge of the defendant's character. Following Williams' testimony as to her knowledge of the defendant's prior felony, the prosecutor left the subject and did not revisit it again, even in her cross-examination of the defendant. Fourth, the court's instructions to the jury served as a curative measure. The court emphasized that the commission of a crime other than the one charged was not admissible to prove the defendant's guilt and limited the jury's consideration of the conviction to the charge of criminal possession of a firearm. The court instructed the jury that it could not consider the defendant's prior conviction as "establishing a predisposition on the part of the defendant to engage in bad conduct." The court also stated that the conviction did not establish "a predisposition on the part of the defendant to commit any of the crimes charged or . . . demonstrate a criminal propensity." Finally, the state's case against the defendant was strong. The jury heard considerable testimony from the victim. In addition, the evidentiary record contained physical evidence from the crime scene as well as the victim's hospital records demonstrating objective evidence of her injuries. The evidence also included the testimony of two security guards, who had witnessed portions of the attack, and security video recordings that corroborated details of the victim's account of the crime.

Our review of the prosecutor's improper references in light of these factors leads us to conclude that the defendant was not deprived of a fair trial.

### III

The defendant next claims that the court improperly admitted a letter he wrote from prison to a girlfriend evincing his plans to flee the state. The defendant argues that the letter was more prejudicial than probative and that the court failed to balance its possible prejudice and probative value prior to admitting it. We do not agree.

The following additional facts and procedural history are required for our resolution of the defendant's claim. Daniel Goyzueta, an officer with the department of correction, testified that on September 9, 2003, while the defendant was incarcerated, correction officers discovered a letter addressed to Aimee Clemons, a girlfriend of the defendant, from an inmate named "Devon G." The letter instructed Clemons to prepare flight plans, passports and identifications, as the author and Clemons would "go to a different state then leave from there . . . ." The author also told Clemons to destroy all information about "us and our plans," including the letter itself. The letter directed Clemons not to speak to anyone of the plans and not to mention them when speaking to the author by telephone, as the author's calls and letters were being monitored.

Prior to trial, the defendant moved to suppress the letter, arguing that its seizure was unconstitutional. Following a suppression hearing, the defendant withdrew the motion to suppress, conceding the constitutionality of the seizure. At trial, the defendant objected to admission of the letter on the ground that it was more prejudicial than probative. The court indicated that it did not find the letter to be more prejudicial than probative but delayed admitting the letter pending additional evidence verifying the defendant's authorship. The state called Marisiela Colon, a girlfriend of the defendant, who testified that the handwriting in the letter belonged

to the defendant. The court eventually admitted the letter over the defendant's objection.

The defendant initially testified on cross-examination that he did not recall writing the letter. Upon further questioning by the prosecutor as to the contents of the letter, however, the defendant testified that he and Clemons "already had plans to leave Connecticut. And I kind of was telling her about don't forget about our plans. I still to this day depend on—plan on leaving Connecticut. That's still a plan we have." Following the conclusion of the evidence, the court instructed the jury as to consciousness of guilt. The court stated that, although the letter could be considered as evidence of the defendant's consciousness of guilt, it did not raise a presumption of the defendant's guilt.[8]

"Unless an evidentiary ruling involves a clear misconception of the law, [t]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of

---

[8] The court's entire instruction on consciousness of guilt evidence was as follows: "In any criminal trial, it's permissible for the state to show that conduct, statements made by the defendant after the time of the alleged offenses may fairly have been influenced by the criminal act or acts; that is, the conduct or statements may show a consciousness of guilt. But they, however, do not raise a presumption of guilt. It's up to you as judges of the facts to decide whether the statements or comments of the defendant reflect a consciousness of guilt and to consider such in your deliberations in conformity with these instructions.

"The evidence that you have concerning the defendant's letter . . . if you find the defendant made the statements contained therein, could be considered as evidence of consciousness of guilt if you find that the statements were influenced by the criminal acts on trial here. If you find the exhibits display an intention to flee trial process . . . you may decide that a consciousness of guilt is shown. Such a consciousness of guilt, if found by you, however, does not raise a presumption of guilt."

discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *Smith*, 275 Conn. 205, 219, 881 A.2d 160 (2005).

Our Supreme Court has stated that "[f]light, when unexplained, tends to prove a consciousness of guilt . . . . Flight is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration. . . . An attempt to escape from custody after arrest is a form of flight, evidence of which may also support an inference of consciousness of guilt." (Citation omitted; internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 521–22, 820 A.2d 1024 (2003). The Supreme Court has held that evidence of a plan to escape, as contrasted with an actual escape attempt, may be admitted properly as evidence of a defendant's consciousness of guilt. Id., 523.

The defendant argues that the letter was more prejudicial than probative because it allowed the jury to speculate that he was guilty when there could have been many reasons why he wrote the letter. Similarly, the defendant in *Coltherst* argued that a handwritten escape plan confiscated from him while he was incarcerated was inadmissible because it would have allowed the jury to ignore all the innocent reasons that the document could have been written and to conclude that he was guilty. Id. The Supreme Court disagreed, stating: "Relevant, probative evidence is not excludable as prejudicial merely because it may tend to show that the defendant is guilty of the crime with which he has been charged." Id., 524; see also *State* v. *Kelly*, 256 Conn. 23, 55, 770 A.2d 908 (2001) ("[t]hat there may

have been other possible explanations for the defendant's flight goes only to the *weight* of the evidence presented by the state, and not its admissibility" [emphasis in original]).

The record reflects that the trial court properly weighed the possible prejudice of the letter against its probative value. Not only did the court find that the letter was not more prejudicial than probative, but it also clearly instructed the jury that the letter did not raise a presumption of guilt and could be considered only as evidence that the defendant was conscious of guilt. This court will not assume that the jury was unable to follow the court's instructions absent contrary evidence. See *State* v. *Booth*, supra, 250 Conn. 626. The defendant's letter was circumstantial evidence from which the jury reasonably could have inferred that he was aware that he was guilty of the crimes with which he had been charged. We conclude that the court did not abuse its discretion in admitting the letter into evidence.

IV

We finally address the defendant's claim that the court improperly instructed the jury. The defendant argues that the jury was misled as to the intent necessary to find him guilty of kidnapping as an accessory because the court provided a general instruction on accessorial liability and did not relate it specifically to the offense of kidnapping. We disagree with the defendant.

The court instructed the jury that the defendant could be found guilty of three of the four substantive offenses with which he was charged—kidnapping in the first degree, sexual assault in the first degree and assault in the first degree—as a principal, as an accessory or as a conspirator under *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). The court then charged the jury on principal and accessory

liability.[9] After providing definitions of *Pinkerton* and conspiracy liability, the court defined kidnapping in the first degree. Following its description of the elements of kidnapping, the court stated: "Under this count, the state has alleged [that] the defendant committed the crime either as a principal, as an accessory, as I've previously defined that term for you, or by way of *Pinkerton* vicarious liability, as I've defined that concept for you." The court thereafter did not repeat its full instruction on accessory liability.

The defendant did not preserve this claim for appeal and, therefore, requests review pursuant to *State* v.

[9] The court instructed the jury on accessory liability as follows: "To find the defendant guilty under the concept of accessory liability means the state has proven that the defendant, *acting with the mental state required for the commission of the offense*, solicited, requested, commanded or intentionally aided another person to engage in conduct which constitutes an offense and shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. If the defendant did any of these things, as specified in the statute, he is guilty of the crime charged as though he directly committed it or participated in its commission.

"To establish the guilt of a defendant as an accessory for assisting in the criminal acts of another, the state must prove criminality of intent and community of unlawful purpose; that is, for the defendant to be guilty as an accessory, it must be established that he *acted with the mental state necessary to commit the crime charged, the intent to commit the crime charged*—in these cases, specific intent, as I've defined that for you—and that, in furtherance of the crime, he solicited, requested, commanded or intentionally aided the principal to commit the crime.

"Evidence of mere presence as an inactive companion or passive acquiescence or the doing of innocent acts, which, if in fact, aid in the commission of the crime, is insufficient to find the defendant guilty as an accessory under the statute.

"Nevertheless, it's not necessary to prove that the defendant actively participated in the commission of the crimes charged. The rule is that a person who assists, requests, commands or intentionally aids in the commission of a crime is guilty of that very crime. Thus, in order to find the defendant guilty of any of these three substantive charges as an accessory, you must find that the state has proven beyond a reasonable doubt that the defendant assisted another to commit the crime charged. You must also find beyond a reasonable doubt that the defendant *had the intent to commit the crime charged* and did solicit, request, command or intentionally aid another in the commission of the crimes charged to find the defendant criminally liable under our statute." (Emphasis added.)

*Golding,* supra, 213 Conn. 239–40. Because the record is adequate for review and the defendant's claim is of constitutional magnitude, we will review the claim under *Golding.* The defendant's claim fails, however, because the alleged constitutional violation does not clearly exist, and he was not clearly deprived of a fair trial. See id.

The standard of review for claims of instructional impropriety is well established. "In determining whether a trial court's charge satisfies constitutional requirements . . . individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks omitted.) *State* v. *Davis,* 283 Conn. 280, 334, 929 A.2d 278 (2007).

"This state . . . long ago adopted the rule that there is no practical significance in being labeled an accessory or a principal for the purpose of determining criminal responsibility. . . . Under the modern approach, a person is legally accountable for the conduct of another when he is an accomplice of the other person in the commission of the crime. . . . [T]here is no such crime as being an accessory . . . . The accessory statute merely provides alternate means by which a substantive crime may be committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Correa,* 241 Conn.

322, 340–41, 696 A.2d 944 (1997). A conviction under our accessorial liability statute requires proof of a dual intent, namely, "that the accessory have the intent to *aid* the principal *and* that in so aiding he intend to *commit* the offense with which he is charged." (Emphasis in original; internal quotation marks omitted.) *State v. Foster*, 202 Conn. 520, 525–26, 522 A.2d 277 (1987).

Mindful of these principles, we review the jury instructions in the present case. The court properly instructed the jury as to the elements of accessorial liability and kidnapping in the first degree. As to accessory liability, the court in three separate instances informed the jury of the need to find that the defendant acted with the intent necessary to commit the underlying offense. Given this particular emphasis, we cannot agree with the defendant that the instruction was improper simply because the court did not repeat the accessory charge following its kidnapping charge. Viewing these specific instructions as we must, in the context of the court's entire instruction, we conclude that it is not reasonably possible that the jury was misled.

The judgment is affirmed.

In this opinion the other judges concurred.