Mitchell *v.* State

# JAMES A. MITCHELL *v.* STATE OF CONNECTICUT ET AL.
## (SC 20287)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Pursuant to statute (§ 54-95 (a)), "[n]o appeal may be taken from a judgment denying a petition for a new trial unless, within ten days after the judgment is rendered, the judge who heard the case . . . certifies that a question is involved in the decision which ought to be reviewed by the Supreme Court or by the Appellate Court."

The petitioner, who had been convicted of numerous crimes, including attempt to commit murder, conspiracy to commit murder, kidnapping in the first degree, sexual assault in the first degree, and assault in the first degree in connection with an incident in which the petitioner and a coconspirator sexually assaulted the victim at gunpoint and then shot her several times, filed a petition for a new trial based on a claim of newly discovered evidence. Specifically, the petitioner claimed that there was newly discovered evidence in the form of technologically enhanced security camera footage that had been shown to the jury, which made it clear that it was the coconspirator and not the petitioner who had exited the petitioner's car and approached the victim's body after she had been shot, as well as certain impeachment evidence relating to the posttrial arrest and conviction of H, the lead detective in the petitioner's criminal case, in connection with H's involvement in a forgery scheme. The petitioner also claimed that the prosecutor improperly withheld certain exculpatory evidence and introduced false testimony from the victim. The trial court denied the petition for a new trial, concluding, inter alia, that the evidence against the petitioner was overwhelming and that it was not probable that the new evidence regarding the security camera footage or H's conviction would produce a different result at a new trial. The petitioner then appealed to the Appellate Court but did so without first seeking certification to appeal pursuant to § 54-95 (a). After the appeal was pending for almost one year, the Appellate Court notified the petitioner that the requisite certification to appeal was lacking. Accordingly, the petitioner filed in the trial court a request for leave to file a late petition for certification to appeal, in which he explained that he had not been provided notice of the appeal procedures and the certification requirement specific to a petition for a new trial, as is the custom in habeas corpus cases. Before argument proceeded

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Mitchell *v.* State

in the trial court on the request for leave, the Appellate Court dismissed the petitioner's appeal for his noncompliance with § 54-95a (a). In denying the petitioner's request for leave, the trial court summarized the reasons why it had rejected the petitioner's enhanced security camera footage claim, indicated that the claim regarding H's posttrial arrest would not have affected the result of the petitioner's criminal trial, and concluded that the petitioner's claims were "meritless and too late." The petitioner again appealed to the Appellate Court, claiming that the trial court had abused its discretion in denying his request for leave to file a petition for certification to appeal because the trial court did not consider the reason for the delay or any other factors relevant to permitting a late filing and, instead, denied his request on the basis of the merits of his appeal. The Appellate Court dismissed the appeal, concluding that, although the trial court had referenced the merits of the petitioner's claims, it also had considered, and largely based its decision on, the length of the petitioner's delay in requesting leave to file a late petition for certification to appeal. On the granting of certification, the petitioner appealed to this court. *Held*:

1. The Appellate Court incorrectly concluded that the trial court had not abused its discretion in denying the petitioner's request for leave to file a late petition for certification to appeal because, in deciding whether to excuse the untimely request, the trial court failed to give due consideration to the petitioner's reason for his late filing: although the trial court considered the length of the petitioner's delay by acknowledging the ten day limit in § 54-95 (a) and stating that the petitioner's claims were "too late," the reason for the delay is a distinct, nontemporal factor that the court must consider separately in deciding whether to excuse an untimely filing, and nothing in the record indicated that the trial court considered the reason advanced by the petitioner, namely, that the custom of providing notice of the certification requirement in habeas cases shows that it is an important procedural hurdle that could be overlooked in the absence of special mention and that he was lulled into error by his prior experience in his habeas case; moreover, this court was not convinced that, if the trial court had considered that reason, it would have denied the petitioner's request, as the petitioner's attorney otherwise diligently pursued the appeal of the denial of his petition for a new trial and complied with the certification requirement in the petitioner's habeas case when he received noticed to do so, the trial court, the Appellate Court and the state all overlooked the petitioner's noncompliance with § 54-95 (a) during the year the appeal was pending, neither the state nor the trial court suggested that the delay resulted in any prejudice, and the petitioner would have no meaningful remedy for his attorney's failure to comply with § 54-95 (a), there being no right to the effective assistance of counsel in connection with a petition for a new trial.

Mitchell *v.* State

2. The judgment of the Appellate Court was affirmed on the alternative ground that the trial court acted within its discretion in denying the petitioner's request for leave to file a late petition for certification to appeal on the ground that the petition for a new trial did not raise any issue warranting appellate review:

a. With respect to the technologically enhanced security camera footage, the petitioner had raised a similar claim in his habeas petition, and the Appellate Court upheld the habeas court's conclusion that the petitioner was not prejudiced by his counsel's alleged failure to adequately investigate the security camera footage to prove that he did not exit the vehicle; moreover, the enhanced footage was not meaningfully exculpatory, as it showed the petitioner wilfully and actively participating in criminal activity, and it would not have had a significant impeachment effect at trial because, although the enhanced footage contradicted the testimony of the victim and another witness that it was the petitioner who exited the vehicle, it was improbable that the jury would have doubted the other aspects of their testimony merely because they confused the petitioner's and his coconspirator's identities, given that the victim was suffering from life-threatening gunshot wounds and the witness was viewing the incident from a distance.

b. Evidence that, after the petitioner's criminal trial, H was arrested and convicted of forgery in the second degree would not have led to a different result at a new trial, as all of the material activities performed by H in connection with the petitioner's criminal case occurred in the presence of others, and the petitioner's coconspirator was convicted at a trial that occurred after H's crimes were made known and through the testimony of a different detective; moreover, evidence that H had been charged with, but not convicted of, fabricating evidence in other criminal cases, which the petitioner contended would support his theory that H had switched the victim's blood sample to produce a negative toxicology test and, thus, avoid revealing that the victim's perception of the events was impaired by drugs, would not probably yield a different result at a new trial in light of the other evidence establishing that the victim was alert and oriented and that she provided accurate information immediately after the incident and after her subsequent surgery.

c. The trial court did not abuse its discretion in concluding that none of the evidence or newly discovered evidence on which the petitioner relied to demonstrate prosecutorial improprieties would be material at a new trial, and nothing in the record suggested that that conclusion was debatable among jurists of reason, that a court could have resolved the claim in a different manner, or that there were any questions that deserve further proceedings.

Argued May 6, 2020—officially released February 26, 2021**

** February 26, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Mitchell *v.* State

*Procedural History*

Amended petition for a new trial following the petitioner's conviction of the crimes of attempt to commit murder, conspiracy to commit murder, kidnapping in the first degree, conspiracy to commit kidnapping in the first degree, sexual assault in the first degree, conspiracy to commit sexual assault in the first degree, assault in the first degree, conspiracy to commit assault in the first degree, and criminal possession of a firearm, brought to the Superior Court in the judicial district of Hartford and tried to the court, *Hon. Edward J. Mullarkey*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment denying the petition, from which the petitioner appealed to the Appellate Court, which dismissed the appeal; thereafter, the court, *Hon. Edward J. Mullarkey*, judge trial referee, denied the petitioner's request for leave to file a late petition for certification to appeal, and the petitioner appealed to the Appellate Court, *Keller*, *Moll* and *Bishop*, *Js.*, which dismissed the appeal; subsequently, the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Dante R. Gallucci*, assigned counsel, for the appellant (petitioner).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Donna Mambrino*, senior assistant state's attorney, and *Gail P. Hardy*, former state's attorney, for the appellee (state).

*Opinion*

ECKER, J. The petitioner, James A. Mitchell, appealed from the trial court's denial of his request for leave to file a late petition for certification to appeal from the court's judgment denying his petition for a new criminal trial on the ground that the petitioner's claims were "meritless and too late." The Appellate Court rejected

Mitchell *v.* State

the petitioner's claim that the trial court improperly considered the merits of the petition, rather than the reasons for the delay or any other factors relevant to permitting a late filing, and dismissed the appeal. See *Mitchell* v. *State*, 188 Conn. App. 245, 247, 204 A.3d 807 (2019). We conclude that the trial court abused its discretion by failing to engage in the proper analysis to determine whether to excuse the late petition for certification. We further conclude, however, that the trial court acted within its discretion when it determined that the petition did not raise issues warranting certification and, therefore, affirm the Appellate Court's judgment dismissing the petitioner's appeal on this alternative basis.

I

The record reveals the following procedural history culminating in the present appeal. Following a jury trial, the petitioner was convicted of attempt to commit murder in violation of General Statutes §§ 53a-8, 53a-49 (a) and 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-48 (a) and 53a-54a (a), kidnapping in the first degree in violation of General Statutes §§ 53a-8 and 53a-92 (a) (2) (A), conspiracy to commit kidnapping in the first degree in violation of §§ 53a-48 and 53a-92 (a) (2) (A), sexual assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-70 (a) (1), conspiracy to commit sexual assault in the first degree in violation of §§ 53a-48 and 53a-70 (a) (1), assault in the first degree in violation of General Statutes §§ 53a-8 and 53a-59 (a) (5), conspiracy to commit assault in the first degree in violation of §§ 53a-48 (a) and 53a-59 (a) (5), and criminal possession of a firearm in violation of General Statutes (Rev. to 2003) § 53a-217 (a) (1).[1] See *State* v. *Mitchell*, 110 Conn. App. 305, 307–308, 955 A.2d 84, cert. denied, 289 Conn. 946,

---

[1] The facts supporting the verdict are addressed in part III of this opinion.

Mitchell *v.* State

959 A.2d 1012 (2008). The trial court, *Mullarkey, J.*, imposed a total effective sentence of fifty-seven years imprisonment. Id., 310. The Appellate Court affirmed the petitioner's conviction on direct appeal. Id., 308, 329.

The petitioner subsequently sought postconviction relief by way of a petition for a new trial and a petition for a writ of habeas corpus. The petitioner was represented by the same attorney in both proceedings. Trial proceeded first on the later filed habeas petition. The habeas court, *Cobb, J.*, denied the petition and thereafter granted the petitioner's petition for certification to appeal pursuant to General Statutes § 52-470 (g). The Appellate Court affirmed the habeas court's judgment. *Mitchell* v. *Commissioner of Correction*, 156 Conn. App. 402, 404, 421, 114 A.3d 168, cert. denied, 317 Conn. 904, 114 A.3d 1220 (2015).

Trial then commenced on the petition for a new trial, before the same judge who had presided over the petitioner's criminal trial.[2] On August 22, 2016, the trial court, *Hon. Edward J. Mullarkey*, judge trial referee, rendered judgment denying the petition. On September 12, 2016, the petitioner filed a request for an extension of time to file his appeal, which the trial court granted on September 13. The petitioner then filed his appeal within the extended deadline.

When the petitioner filed the appeal from the trial court's denial of his petition for a new trial, he did so without first obtaining certification to do so in accordance with General Statutes § 54-95 (a),[3] which provides

_____

[2] By this time, Judge Mullarkey had reached the mandatory retirement age of seventy and had become a judge trial referee.

[3] General Statutes § 54-95 (a) provides in relevant part: "Any defendant in a criminal prosecution, aggrieved by any decision of the Superior Court, upon the trial thereof, or by any error apparent upon the record of such prosecution, may be relieved by appeal, petition for a new trial or writ of error, in the same manner and with the same effect as in civil actions. No appeal may be taken from a judgment denying a petition for a new trial unless, within ten days after the judgment is rendered, the judge who heard the case or a judge of the Supreme Court or the Appellate Court, as the

Mitchell *v.* State

that certification to appeal shall be obtained "within ten days after the judgment is rendered . . . ." See *Santiago* v. *State*, 261 Conn. 533, 543–44, 804 A.2d 801 (2002). That appeal had been pending for almost one year when, on September 5, 2017, the Appellate Court notified the petitioner that the requisite certification to appeal was lacking. On September 8, 2017, prior to the hearing in the Appellate Court to show cause why his appeal should not be dismissed, the petitioner filed in the trial court a request for leave to file a petition for certification to appeal, to which the petition for certification was appended. To explain his failure to seek certification within the statutory time limitation, the petitioner alleged in that request that, "[a]lthough analogous to a petition for certification to appeal in a habeas corpus case, the petitioner was not provided with a written notice of appeal procedures via [Judicial Branch] form JD-CR-84, as is the custom in habeas corpus cases . . . ." The respondent, the state of Connecticut,[4] filed an opposition to the request. Its opposition cited the one year delay in seeking certification and the frivolousness of the grounds raised in the petition for a new trial. Before argument was heard on the request, the Appellate Court dismissed the petitioner's appeal for failure to obtain certification in compliance with § 54-95 (a).

Argument proceeded in the trial court on the petitioner's request for leave to file the petition for certification to appeal. The court orally denied the request at the conclusion of the hearing and subsequently issued a written decision. The decision noted the ten day statutory time limit prescribed for seeking certification to appeal but did not address any particular facts regarding

case may be, certifies that a question is involved in the decision which ought to be reviewed by the Supreme Court or by the Appellate Court. . . ."

[4] Although the petitioner named Sandra Tullius as an additional respondent, that individual is not a party to this appeal.

the petitioner's excuse for failing to meet that requirement or the significance of the procedural nonconformity. Instead, it summarized reasons why the court previously had determined that the principal evidence on which the new trial petition relied would not have changed the outcome had such evidence been available at the criminal trial. It then concluded that the petitioner's claims were "meritless and too late."

The petitioner appealed to the Appellate Court, claiming "that the [trial] court abused its discretion in denying his request because the court, in considering the length of the delay in filing the request, did not consider the reasons for the delay or any other factors relevant to permitting a late filing but, rather, addressed the merits of the petitioner's appeal." *Mitchell* v. *State*, supra, 188 Conn. App. 247. The Appellate Court dismissed the appeal. Id. It reasoned that, "although the petitioner is correct that [the trial court] referenced the merits of the petitioner's claims on appeal, it also made clear that its decision was based in large part on the petitioner's delay . . . ." Id., 250. The Appellate Court acknowledged that the petitioner's request for leave had attributed the delay to not having been provided with a written notice of appeal procedures but concluded that this fact could not excuse the delay because no such notice was required and, even if it were, the failure to afford that notice would not operate as a waiver of the certification requirement. Id. The Appellate Court also acknowledged that the trial court never expressly addressed the notice issue but opined that, "by considering the length of the petitioner's delay, the court afforded due regard to the reasons for the delay, and, thus, the court's denial of the petitioner's request for leave to file a late petition for certification to appeal was not an abuse of discretion." Id.

We granted the petitioner's petition for certification to appeal to this court to decide whether the Appellate

Mitchell *v.* State

Court correctly concluded that the trial court did not abuse its discretion in denying the petitioner's late petition for certification to appeal. See *Mitchell* v. *State*, 331 Conn. 920, 205 A.3d 567 (2019). The threshold question raised by the certified issue is whether the trial court improperly ignored considerations relevant to assessing whether to excuse a late request for certification to appeal. Because we answer that question in the affirmative, we also consider whether the trial court's decision could be sustained on the basis of its determination that the petition for a new trial raised no claims warranting appellate review. We conclude that this latter determination was not an abuse of discretion.

II

The petitioner contends that the trial court abused its discretion when it denied his request for leave to file the petition for certification because that decision was not made in accordance with this court's direction in *Santiago* v. *State*, supra, 261 Conn. 543. He argues that, in assessing the length of the delay, the trial court improperly failed to discount the period during which he was pursuing the appeal from the denial of his petition. This argument was raised at the hearing before the trial court and in the petitioner's Appellate Court brief, but it was not addressed by the Appellate Court. The petitioner also renews the argument that was rejected by the Appellate Court, namely, that the trial court improperly considered the merits of the petition for certification rather than the reasons for delay and other factors relevant to the timeliness of his request for certification. We agree, in part, with the petitioner's second argument.

A petition for a new trial, like a petition for a writ of habeas corpus, provides a "critical procedural mechanism for remedying an injustice." *Seebeck* v. *State*, 246 Conn. 514, 531, 717 A.2d 1161 (1998). If a new trial

Mitchell *v.* State

petition is denied, there is a statutory right to appeal, subject to this condition: "No appeal may be taken from a judgment denying a petition for a new trial unless, within ten days after the judgment is rendered, the judge who heard the case or a judge of the Supreme Court or the Appellate Court, as the case may be, certifies that a question is involved in the decision which ought to be reviewed by the Supreme Court or by the Appellate Court." General Statutes § 54-95 (a).

The legislature adopted certification requirements to eliminate frivolous postconviction appeals. *Seebeck* v. *State*, supra, 246 Conn. 531. Certification requirements were concurrently adopted for appeals from the denial of a habeas petition and appeals from the denial of a new trial petition. Id., 530; see also 7 S. Proc., Pt. 5, 1957 Sess., pp. 2936–40, remarks of Senator Elmer S. Watson. Both schemes prescribe a ten day period after judgment is rendered for filing the petition for certification. See General Statutes §§ 52-470 (g) and 54-95 (a).

To determine the contours of the requirements set forth in § 54-95, this court has looked to the more developed body of habeas case law considering the certification requirement in § 52-470. See, e.g., *Santiago* v. *State*, supra, 261 Conn. 537–40; *Seebeck* v. *State*, supra, 246 Conn. 529–33. We held in *Seebeck* that the legislature did not intend for the certification requirement to limit the jurisdiction of the appellate tribunal but only to define the scope of appellate review. See *Seebeck* v. *State*, supra, 533. We also concluded that the same standard of review applied under both statutes, namely, whether the trial court clearly abused its discretion in denying the request for certification to appeal. Id., 533–34. In *Santiago*, we concluded that, although the certification requirement is not jurisdictional in nature, it is nonetheless a mandatory prerequisite to appeal from the denial of a new trial petition because of the essential purpose that certification serves. See *Santiago*

Mitchell *v.* State

v. *State*, supra, 539–40. We further held that, because
this requirement serves important public and institu-
tional policy objectives independent of, and paramount
to, the state's particularized interest in any specific
case—namely, the conservation of judicial resources—
it is not subject to waiver due to the state's failure to
move to dismiss the appeal within the time limit pre-
scribed for the dismissal of nonjurisdictional defects
under our rules of practice. See id., 543–44, citing Prac-
tice Book § 66-8.

Although *Santiago* refused to countenance abject
noncompliance with the certification requirement, this
court recognized in that case that noncompliance was
a defect that could be cured even after the statutorily
prescribed time limit. We observed: "In the event that
the petitioner does seek certification to appeal from
the judgment of the trial court denying his petition for
a new trial, that court will be required to decide whether
to excuse the petitioner's delay in filing his petition for
certification to appeal . . . *with due regard to the
length of the delay, the reasons for the delay, and any
other relevant factors*. In considering the length of the
delay, the trial court should be mindful of the fact that
most of that delay is attributable to the petitioner's
efforts to seek direct appellate review from the judg-
ment denying his petition for a new trial. Because the
procedural avenue followed by the petitioner in [*Santi-
ago*] appears to have raised an issue of first impression
in this state, we do not believe that the delay resulting
from the appellate litigation of that issue should be
weighed heavily, if at all, against the petitioner.''[5] (Cita-

[5] The petitioner in *Santiago* had appealed from the denial of the petition
for a new trial without requesting certification to appeal. See *Santiago* v.
*State*, supra, 261 Conn. 536. After the appeal had been pending for approxi-
mately ten months, the state moved to dismiss the appeal due to this defect,
and the Appellate Court granted the motion. Id. On appeal to this court, the
petitioner argued that the certification requirement in § 54-95 (a) is not
jurisdictional and, accordingly, that the state had waived this defect by
failing to file its motion to dismiss within the time limit prescribed by

Mitchell *v.* State

tion omitted; emphasis added.) Id., 545 n.18. We noted that the decision whether to entertain an untimely request for certification to appeal would be a matter left to the trial court's discretion but again underscored that, "[i]n exercising that discretion, the court should consider the reasons for the delay." Id., 544–45 n.17.

The present case provides our first opportunity since *Santiago* to consider a trial court's exercise of discretion to deny leave to file a late petition for certification under § 54-95.[6] Our consideration of this issue is subject to the general principle that "every *reasonable* presumption should be given in favor of the correctness of the court's ruling." (Emphasis added; internal quotation marks omitted.) *Alliance Partners, Inc.* v. *Voltarc Technologies, Inc.*, 263 Conn. 204, 210, 820 A.2d 224 (2003).

Practice Book § 66-8 for the dismissal of nonjurisdictional defects. Id., 537, 543. Had the petitioner in *Santiago* prevailed on this issue of first impression, he would have been entitled to proceed with his appeal despite his failure to seek certification to appeal.

[6] Section 54-95 contains a novel feature that was not considered in *Santiago* and that has not yet been considered by our appellate courts. Unlike other statutes with certification requirements, § 54-95 vests authority equally in the trial judge and appellate judges to certify the appeal. See General Statutes § 54-95 (a) (vesting authority to certify appeal in "the judge who heard the case or a judge of the Supreme Court or the Appellate Court, as the case may be"). Appellate certification authority also existed at one time under our habeas statute, § 52-470, but has since has been eliminated. See Public Acts 2002, No. 02-132, § 78. Similar authority continues to exist under current federal habeas law. Under federal law, a circuit judge or a federal court of appeals has authority to issue the certificate of appealability, both in the first instance and in the event that a district court denies the certificate. See 28 U.S.C. § 2253 (c) (2018); Fed. R. App. P. 22 (b).

In neither *Santiago* nor the present case did the petitioner request certification from the Appellate Court; nor did that court take upon itself the prerogative to exercise its statutory certification authority. Cf. *Mickens-Thomas* v. *Vaughn*, 355 F.3d 294, 303 (3d Cir. 2004) (noting that it was proper for federal court of appeals to treat timely notice of appeal as request for certificate of appealability and to grant certification on its own). Whether this appellate certification authority affects the standard of review that we apply to a trial court's decision denying leave to file a late petition for certification or denying certification was not considered in *Santiago* and is not an issue that either party has asked us to consider in the present case.

Mitchell *v.* State

A presumption of correctness will not carry the day when there is evidence that the trial court failed to follow the applicable law. See, e.g., *Rosenblit* v. *Danaher*, 206 Conn. 125, 134, 537 A.2d 145 (1988); *Disciplinary Counsel* v. *Parnoff*, 158 Conn. App. 454, 470, 119 A.3d 621 (2015), aff'd, 324 Conn. 505, 152 A.3d 1222 (2016). In particular, it is an abuse of discretion to rely on "improper or irrelevant factors"; (internal quotation marks omitted) *Georges* v. *OB-GYN Services, P.C.*, 335 Conn. 669, 687, 240 A.3d 249 (2020); accord *State* v. *Holley*, 327 Conn. 576, 628, 175 A.3d 514 (2018); or to fail to consider the reason for an untimely filing, if one is advanced by the petitioner. See *Roberto* v. *Honeywell, Inc.*, 33 Conn. App. 619, 625–26, 637 A.2d 405, cert. denied, 229 Conn. 909, 642 A.2d 1205 (1994); *Segretario* v. *Stewart-Warner Corp.*, 9 Conn. App. 355, 362, 519 A.2d 76 (1986); see also *Alvarado* v. *Commissioner of Correction*, 75 Conn. App. 894, 895–96, 818 A.2d 797 (rejecting argument that trial court had affirmative duty, sua sponte, to inquire into reasons for untimely petition for certification to appeal), cert. denied, 264 Conn. 903, 823 A.2d 1220 (2003).

In addition to these general principles, one further consideration specific to petitions for a new trial bears on the trial court's treatment of an untimely request for certification under § 54-95. In the intervening period since *Santiago*, this court has made clear that, because there is no constitutional or statutory right to counsel in connection with a petition for a new trial, there is no right to effective assistance of counsel in such a proceeding. See *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 701–702, 159 A.3d 1112 (2017). What this means for present purposes is that, if a request for certification to appeal is untimely filed due to counsel's negligence, and the delay is not excused, the petitioner has no recourse in *any* forum. His appellate rights are forfeited, and we are unaware of any means under cur-

Mitchell *v.* State

rent law by which he can seek relief for counsel's ineffective assistance in the loss of a potentially meritorious appeal.[7] The irremediable and absolute character of the forfeiture in new trial proceedings resulting from a lawyer's failure to comply with a nonjurisdictional time limitation does not compel excusal of every untimely request for certification to appeal. But it does elevate the importance of the trial court's obligation to give ''*due regard* to the length of the delay, the reasons for the delay, and any other relevant factors''; (emphasis added) *Santiago* v. *State*, supra, 261 Conn. 545 n.18; and call for a reviewing court to ensure that the record fairly reflects that this obligation has been met. Cf. *Alliance Partners, Inc.* v. *Voltarc Technologies, Inc.*, supra, 263 Conn. 211 (discretion vested in trial court ''imports something more than leeway in decision making and . . . should not impede or defeat the ends of substantial justice'' (internal quotation marks omitted)).

With this observation and *Santiago*'s directive in mind, we review the trial court's memorandum of decision in the present case denying the petitioner's request for leave to file the late petition for certification. The trial court's decision began by reciting the mechanisms through which the petitioner unsuccessfully had sought a new trial: a direct appeal, a habeas petition, and a petition for a new trial. The trial court noted the substantial overlap in the issues raised in the habeas and new trial petitions, ''with the addition of an unsubstantiated claim of newly discovered evidence.'' It then briefly summarized the reasons why it had rejected the princi-

---

[7] Even in the habeas context—in which relief *is* available to remedy harm caused by an attorney's negligence—the gravity of the loss of discretionary appellate review due to counsel's failure to timely file a petition for certification has been deemed an ''exceptional [circumstance]'' that warranted treating such conduct as prejudicial per se for purposes of establishing a claim of ineffective assistance of counsel. See *Iovieno* v. *Commissioner of Correction*, supra, 242 Conn. 706–707.

Mitchell *v.* State

pal claim in the petition for a new trial regarding security camera still frames and videotape capturing certain parts of the incident giving rise to the criminal charges.

The trial court then turned to the requirement to obtain certification to appeal, stating: ''[Section] 54-95 (a) required the petitioner to file within ten days after the judgment is rendered. [The] court, in good conscience, cannot find that the issue(s) raised ought to be reviewed by a higher court. *Santiago* v. *State*, [supra, 261 Conn. 533].'' This conclusion was followed by an explanation that apparently referred back to the court's earlier discussion regarding the lack of merit to the security camera issue: ''*Similarly*, claims concerning former [Hartford Police Detective] Alfred Henderson's posttrial arrest would not have had any effect on the petitioner's jury trial. The petitioner's coconspirator [Travis Hampton] was tried by the same court four months after the petitioner. Unlike the petitioner, Hampton did not testify and admit [to] being at the scenes of the crimes. He was convicted of nine felonies in a case in which a different detective testified. *State* v. *Hampton*, 293 Conn. 435 [988 A.2d 167] (2009). The petitioner's claims are meritless and too late. *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689 [699 A.2d 1003] (1997).

''Request denied.'' (Emphasis added.)

We conclude that the trial court's ruling, although adequate in certain respects, fails to fully comport with our direction in *Santiago*.

With respect to *Santiago*'s first requirement, which instructs the trial court to give due consideration to the length of the delay, the only reference to this factor in the trial court's decision is its acknowledgement of the statutorily prescribed time limit and its conclusion that

Mitchell *v.* State

the petitioner's claims are "meritless *and too late.*"[8] (Emphasis added.) Both parties agree that there is no indication that the trial court gave any consideration to the existence or circumstances of the appellate litigation when assessing the length of the delay, an issue raised by the petitioner at the hearing before the trial court. The petitioner argues that *Santiago* directed the trial court to take the appellate litigation into account, whereas the state argues that, under the present circumstances, the appellate litigation was not relevant to the delay in seeking certification.

We do not entirely agree with either party's position. The state is correct that the appellate litigation in *Santiago*, unlike in the present case, was in pursuit of an issue of first impression that, if successful, could have excused the failure to seek certification. See footnote 5 of this opinion. But this reasoning does not make the course and duration of the appellate litigation per se irrelevant in cases arising after *Santiago*. Other facts relating to the appellate litigation were pertinent to assessing the length of the delay in the present case. Specifically, the petitioner's counsel, evidently unaware of the certification requirement in § 54-95 (a), filed what otherwise would have been a timely appeal from the denial of the new trial petition, having obtained an

---

[8] Given that the only statement in the decision relevant to the length of the delay was the trial court's recitation of the statutory time limit, the court's use of the term "too late" could be understood as nothing more than a nonevaluative truism, that is, a factual observation that the request for certification was filed after the ten day statutory time limit. Such a statement of fact, of course, would be the starting point for the due consideration analysis required by *Santiago* but would not itself provide the necessary substantive analysis. The alternative interpretation understands the phrase "too late" to embody an implied *evaluation* of the length of the delay as excessive. We will assume, as the parties do, that the trial court considered the length of the delay, at least in the sense that the court clearly was aware of the fact that the certification request was filed approximately one year after the new trial petition was denied.

Mitchell *v.* State

extension of time to file that appeal.[9] The trial court granted that extension, notwithstanding the procedural irregularity that ultimately returned the petitioner to the trial court, and did so without alerting the petitioner to the fact that his appeal could not proceed without certification. The Appellate Court similarly granted the petitioner an extension of time to file his appellate brief, which he then filed in due course; the extension was granted without any notification to the petitioner that the appeal could not proceed without the missing certification. The Appellate Court thereafter granted the state two extensions of time to file its brief but, again, did not notify the petitioner until months later that his appeal could not proceed without certification. No doubt it was the petitioner's responsibility to ensure that he complied with the statutory requirements. Nonetheless, the repeated failure of two different courts to bring this defect to the petitioner's attention, while at the same time approving extension requests, as well as the state's decision to seek extensions of time for filing its appellate brief rather than moving to dismiss the appeal, could well have affected a trial court's assessment of the fairness of holding the petitioner strictly accountable for the entire year's delay in seeking certification.[10]

Notwithstanding our concerns, we cannot say that the trial court failed to give due regard to the length

[9] By "timely," we mean only that the appeal was filed within the period prescribed under our rules of practice, as extended by the trial court. We recognize that, because certification to appeal is a mandatory condition precedent to an appeal, the appeal was defective in the absence of certification.

[10] Although the petitioner never raised this issue, we also question the fairness of counting the entire year against the petitioner when it appears that the Appellate Court had statutory authority to determine on its own initiative whether certification to appeal should be granted. See footnote 6 of this opinion. The trial court alternatively could have considered the appellate litigation as an independent "relevant factor" rather than as part of its assessment of the length of the delay. There is no indication that it did so.

Mitchell *v.* State

of the delay under the circumstances presented. The petitioner did not draw this particular aspect of the appellate litigation to the trial court's attention; instead, he incorrectly assumed that *Santiago* suggested that the trial court always should discount the period of appellate litigation in assessing the length of the delay. In the absence of any focused argument by the petitioner, it was sufficient for the trial court to acknowledge the statutory time limit and to state a conclusion that the claims were "too late."

We reach a different conclusion with respect to the question whether the trial court gave due regard to the reason for the delay. As the Appellate Court recognized, the petitioner did clearly assert a reason for the delay in his request, namely, the lack of notice to the petitioner of appellate procedures like the notice provided in habeas appeals. The trial court is not entitled to a presumption that it gave due consideration to this claim under the circumstances presented. There is not a single phrase or statement in the record, either during the hearing on the petitioner's request or in the trial court's decision, from which we reasonably could infer that the trial court considered the proffered reason for the delay. The Appellate Court's conclusion to the contrary rested on an untenable assumption—that the trial court considered the *reason* for the delay when it considered the *length* of the delay. This conclusion ignores that the reason for the delay is a distinct, nontemporal factor that must be considered under *Santiago*. It may be that the longer the delay, the more compelling the reason must be to excuse that delay. But, even under such a rationale, consideration of the latter is not subsumed by an assessment of the former in the absence of an indication of any kind that the petitioner's proffered excuse was duly considered.

The record does not even reflect any indication that the trial court understood that it was obligated, as

Mitchell *v.* State

directed by *Santiago*, to give due regard to the reason for the delay. The factors identified in *Santiago* were never mentioned in the court's decision or in its comments at the hearing.[11] Although the trial court was not required to credit the reason offered by the petitioner, it was required, at a minimum, to give some indication that it had at least considered whether the proffered reason excused the delay under the circumstances. See *Carter* v. *State*, 194 Conn. App. 208, 215, 220 A.3d 886 (2019) (trial court's order sufficiently demonstrated that it had considered petitioner's stated reason for delay in filing petition, as required by *Santiago*, by stating that "the petitioner has failed to establish good cause for a delay of over four months after the expiration of the appeal period" (internal quotation marks omitted)); cf. *Worden* v. *Francis*, 170 Conn. 186, 188, 365 A.2d 1205 (1976) ("[w]ithout repeating all the considerations mentioned by the trial court, it suffices to note that the court fully realized the discretionary power it was called upon to exercise and concluded that '[w]hile the court is empowered to grant the motion [for a late substitution] upon a finding of good cause, good cause has not been shown by the plaintiff' "); *Kendzierski* v. *Goodson*, 21 Conn. App. 424, 427, 574 A.2d 249 (1990) (trial court did not ignore good cause requirement for termination because, "[a]lthough the court did not explicitly use the term 'good cause,' it is clear, from the context of the court's ruling and from its specific finding that the plaintiff proved a desire for a higher rent, that its decision was based on the good cause requirement"). It is especially important to do so when, as here, the consequences of an adverse determination involve the

---

[11] The court's citations to *Santiago* v. *State*, supra, 261 Conn. 533, and *Iovieno* v. *Commissioner of Correction*, supra, 242 Conn. 689, do not fairly suggest otherwise. The trial court cited those cases as support for propositions wholly unrelated to the petitioner's proffered excuse for filing his petition late, namely, those bearing on the merits of certification.

Mitchell *v.* State

permanent and irrevocable loss of the petitioner's ability to seek relief.

It may well be appropriate for us to overlook the trial court's failure to consider the reason offered by the petitioner for the delay if that reason could not have provided a basis to excuse the untimely request for certification, had it been considered. However, we are not persuaded that the trial court, giving due consideration to the reason proffered by counsel, would have been compelled to deny the request under these circumstances.

The petitioner's request alleged that, "[a]lthough analogous to a petition for certification to appeal in a habeas corpus case, the petitioner was not provided with a written notice of appeal procedures via [Judicial Branch] form JD-CR-84, as is the custom in habeas corpus cases . . . ."[12] The record indicates that, in his earlier habeas proceedings in which he presumably was afforded such notice, the petitioner filed a timely request for certification to appeal. The petitioner did not argue that there is legal authority requiring similar notice in new trial petition proceedings; nor did he argue that the statutory certification requirement was ambiguous. He thus was effectively making an equitable argument, i.e., that the custom of providing notice of the certification requirement in habeas proceedings demonstrates an awareness that it is an important procedural hurdle that could be overlooked in the absence

_____

[12] There is no statute or rule of practice that requires a habeas petitioner to be given notice of the habeas appeal procedures. The first paragraph of the Judicial Branch's habeas appeal form referenced in the petitioner's request provides notice of both the requirement to seek certification to appeal from a habeas court's decision denying a petition for a writ of habeas corpus and the time limit prescribed by statute for taking that action. See Notice of Appeal Procedures (Habeas Corpus), CT Judicial Branch Form JD-CR-84, available at https://www.jud.ct.gov/webforms/forms/CR084.pdf (last visited February 24, 2021). The Judicial Branch currently does not have a comparable notice form that is given to a party whose petition for a new trial is denied.

Mitchell *v.* State

of special mention and that he was lulled into error by his prior experience in his habeas case, in which he did comply with the certification requirement after having received notice.[13]

We have not previously considered what constitutes an adequate reason to excuse delay in this context. The petitioner's attorney conceded at oral argument before this court that, regardless of his lack of actual knowledge of the statutory certification requirement, he had a duty to ascertain the pertinent appeal requirements. Attorney negligence generally has not been deemed to constitute good cause for an untimely action in other contexts. See, e.g., *Georges* v. *OB-GYN Services, P.C.*, supra, 335 Conn. 691 (late appeal under Practice Book § 63-1); *Alliance Partners, Inc.* v. *Voltarc Technologies, Inc.*, supra, 263 Conn. 207–209 (same); *Jaquith* v. *Revson*, 159 Conn. 427, 431–32, 270 A.2d 559 (1970) (motion to open judgment of nonsuit rendered for lack of timely compliance with court order); see also *Percy* v. *Lamar Central Outdoor, LLC*, 147 Conn. App. 815, 819–20, 83 A.3d 1212 (motion to set aside default on basis of attorney negligence), cert. denied, 311 Conn. 932, 87 A.3d 580 (2014). In the context of a late filed petition for certification to appeal under § 54-95 (a), however, we discern important distinguishing characteristics that could persuade a trial court, in its discretion, to consider an attorney's negligence as a valid excuse under the present circumstances. In particular, the litigant lacks any meaningful remedy for his attorney's negligence if the delay is not excused, the attorney otherwise diligently pursued the appellate litigation, the courts and the state also apparently overlooked the certification requirement when sanctioning extensions

---

[13] In his petition for certification to appeal to this court, the caption to one of the petitioner's arguments asserted that notice of appellate procedures is "mandatory." Reading his argument in its entirety, however, indicates that his position is not that there currently exists such a requirement but that such a requirement *should* exist.

Mitchell *v.* State

of time to pursue the appeal in the absence of a request for or grant of certification, neither the state nor the trial court suggested that the delay resulted in any prejudice to the state or the court system,[14] and a lengthy term of imprisonment is at stake.

Other factors that have been considered in weighing whether to excuse untimely actions in other contexts have taken into account whether the delay was intentional or for strategic advantage; see, e.g., *State* v. *L'Heureux*, 166 Conn. 312, 319–20, 348 A.2d 578 (1974); *Meribear Products, Inc.* v. *Frank*, 193 Conn. App. 598, 606, 219 A.3d 973 (2019); whether the delay could be personally attributed to the client; see, e.g., *Janulawicz* v. *Commissioner of Correction*, 310 Conn. 265, 274 n.11, 77 A.3d 113 (2013); *Ramos* v. *Commissioner of Correction*, 248 Conn. 52, 61–62, 727 A.2d 213 (1999); *Langston* v. *Commissioner of Correction*, 185 Conn. App. 528, 532–33, 197 A.3d 1034 (2018), appeal dismissed, 335 Conn. 1, 225 A.3d 282 (2020); and whether the delay caused prejudice to the opposing party. See, e.g., *Janulawicz* v. *Commissioner of Correction*, supra, 274–75; *Horton* v. *Meskill*, 187 Conn. 187, 194, 445 A.2d 579 (1982); *Meribear Products, Inc.* v. *Frank*, supra, 606; *Warner* v. *Lancia*, 46 Conn. App. 150, 157, 698 A.2d 938 (1997). None of those concerns is implicated in the present case.

We therefore conclude that the trial court abused its discretion when it failed to accord due and proper consideration to the reason for the delay in deciding whether to excuse the untimely request for certification.[15]

_____

[14] To the extent that one purpose of the time limit for requesting certification may be to allow the trial court to reconstruct the reasons that led to its denial of the petition for a new trial while its recall is fresh, there is no indication in the present case that the delay in any way impeded the court's recall or evaluation of the merits.

[15] The appeal as presented does not require us to decide whether it would have been appropriate for the trial court to consider the merits of the appeal, as an additional relevant factor, after giving due regard to the length of the delay and the reason for the delay.

Mitchell *v.* State

## III

Our decision to venture beyond the trial court's procedural holding and to review the merits of the appeal is made easier because there is no dispute that the trial court itself reached a conclusion on the merits of the petition for certification. This fact is clear not merely from the court's final pronouncement that the petitioner's claims are "meritless and too late" but by its statement that, "in good conscience, [it] cannot find that the issue(s) raised ought to be reviewed by a higher court," which mirrors the statutory standard for certification. See General Statutes § 54-95 (a) ("the judge who heard the case . . . certifies that a question is involved in the decision which *ought to be reviewed by the Supreme Court or by the Appellate Court*" (emphasis added)). The trial court's decision sets forth reasons to explain this conclusion as to the principal grounds raised in the petition.

Although the petitioner contends that the trial court improperly considered the merits of his petition as a basis to deny leave to file the petition for certification, we ascribe a different intention to the court in making that determination. We construe the court's decision to conclude, in effect, that (1) the request for certification to appeal was untimely, and, therefore, it would not grant leave to seek certification, and (2) alternatively, even if it were to excuse the untimely request, it would not grant certification to appeal. In light of our conclusion in part II of this opinion, the first ground cannot sustain the court's decision. We therefore consider this alternative ground.[16] We conclude that the trial court

---

[16] Both parties have addressed in their briefs to this court whether the trial court's conclusion as to the merits was correct. We note that this alternative ground goes to the heart of the purpose of § 54-95 (a), which is to determine whether the petition for a new trial raised any issue that warrants appellate review. For the reasons explained in part II of this opinion, we face a situation in the present case in which the trial court made a determination regarding that substantive matter without engaging in a proper analysis of the threshold procedural issue of whether to excuse the

Mitchell *v.* State

did not abuse its discretion in finding no merit to the claims and affirm the judgment of the Appellate Court on that basis.

The petitioner sought a new trial on the basis of newly discovered evidence, as well as "for other reasonable cause . . . ." General Statutes § 52-270 (a). To assess whether the trial court correctly concluded that the petitioner raised no claims in his petition for a new trial that warranted appellate review, we begin with the evidence presented at his criminal trial to provide the necessary context. See *Shabazz* v. *State*, 259 Conn. 811, 827, 792 A.2d 797 (2002) (when ruling on petition for new trial, "[t]he trial court must always consider the newly discovered evidence in the context of the evidence presented in the original trial").

A

In the petitioner's direct appeal from his conviction, the Appellate Court set forth the following facts that the jury reasonably could have found, which we have supplemented with additional facts relevant to the present appeal. "On August 23, 2003, following an evening at a nightclub, the victim[17] was dropped off at a friend's house in East Hartford. Wanting to return home, and

petitioner's untimely request for certification. A late request is not, however, a jurisdictional bar to consideration of the merits. Lateness matters only to the extent that it may prevent the petitioner from obtaining a ruling on the merits of his petition. This unusual procedural posture allows us to review the trial court's merits determination.

Of course, if we were to infer from the fact that, by reaching the merits, the trial court excused the lateness of the request for certification; see *Iovieno* v. *Commissioner of Correction*, supra, 242 Conn. 700 n.6 ("[o]nce a court has decided to exercise its discretion and [to] consider an untimely petition [for certification to appeal], it should proceed in the usual manner to consider the merits of the petition"); we necessarily would review the merits of certification.

[17] "In accordance with our policy of protecting the privacy interests of victims of sexual abuse, we do not identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e." *State* v. *Mitchell*, supra, 110 Conn. App. 308 n.1.

Mitchell *v.* State

with her residence too distant to walk, the victim called the [petitioner] for a ride [after she was unsuccessful in getting a ride from several other friends]. The victim chose to call the [petitioner] because she knew that Denasha Sanders, the mother of one of the [petitioner's] children, had lived in the same building as the victim and that the [petitioner] was frequently in the vicinity. . . .

"The [petitioner] arrived driving a gold Nissan Altima accompanied by another man, unknown to the victim at the time, but later identified as . . . Hampton. The victim agreed to go with the [petitioner] and Hampton to downtown Hartford to get something to eat. [When they arrived at the restaurant, the petitioner remained in the car, speaking to Sanders on his cell phone, while the victim and Hampton went into the restaurant. After they returned to the car], the [petitioner] became violent with the victim, striking her with his cell phone and demanding to know the location of the victim's brother [who had been dating Sanders]. Out of fear that the [petitioner] would harm her [brother], the victim lied to the [petitioner] and told him that her brother was at her grandfather's house. The victim attempted to leave the car, but the [petitioner] pulled her by the hair and locked the doors. During this time, Hampton remained in the backseat of the vehicle.

"The [petitioner] subsequently determined that the victim's brother was not at her grandfather's house. He drove the victim and Hampton to his mother's house in Hartford and ordered the victim out of the car. The victim briefly complied and then returned to the vehicle while the [petitioner] and Hampton entered the house. When the [petitioner] and Hampton returned, the three proceeded to leave the area by car. The [petitioner] apologized to the victim for hitting her and offered her marijuana, which she accepted. Instead of driving the victim [south on Market Street toward her home, however, the petitioner turned north on Market Street and

Mitchell *v.* State

parked behind a building on Market and Pequot Streets, on the opposite corner from a Citgo gas station]. The [petitioner] told the victim he wanted to have sex with her and proposed that they go to a hotel . . . .

"The victim refused and got out of the car, intending to walk home. The [petitioner] produced a shotgun, which he gave to Hampton, who pointed the weapon at the victim's face. The [petitioner] and Hampton told the victim to remove her pants. The victim [complied, and] the [petitioner then] raped her vaginally from behind [while Hampton pointed the shotgun at her face]. When the [petitioner] was finished, he [regained possession of the shotgun and demanded that] the victim . . . perform fellatio on Hampton. The victim complied briefly, [but when she refused to continue] Hampton [penetrated her vaginally for a moment], while the [petitioner] . . . held the shotgun. [When Hampton stopped, the] victim grabbed her pants . . . yelled at the [petitioner] to let her leave [and promised that she would not tell anyone what had happened]. The [petitioner] told the victim she could [either] get into a nearby dumpster or run. As the victim attempted to run, the [petitioner] shot her in the side of the stomach. The victim [ran across Pequot Street toward the Citgo station but was] followed by Hampton, who now had the shotgun. The [petitioner] pursued the victim in the car and blocked her path. [The victim ran from the Citgo station across Market Street and attempted to hide behind a tree on Market Street, but Hampton found her and shot her several times. At one point, she heard the petitioner say to Hampton '[m]ake sure that bitch is dead.' The victim held her breath and attempted to play dead. The petitioner and Hampton] then left the scene [in the vehicle]. Shortly thereafter, [they] returned briefly [stopped the vehicle close to the victim's location to see if she was dead] and then left the area again. The victim [grabbed her left arm, which was almost

Mitchell *v.* State

severed by a gunshot blast to her elbow, and] dragged herself to the street, where she was found by a passing driver. The police and paramedics were summoned, and the victim was taken to Hartford Hospital for treatment.''[18] (Footnote in original.) *State* v. *Mitchell*, supra, 110 Conn. App. 308–10.

The victim identified the petitioner as the perpetrator shortly after her breathing tube was removed following surgery. He was arrested and charged with attempt to commit murder, conspiracy to commit murder, kidnapping in the first degree, conspiracy to commit kidnapping in the first degree, sexual assault in the first degree, conspiracy to commit sexual assault in the first degree, assault in the first degree, conspiracy to commit assault in the first degree, and criminal possession of a firearm.

At the petitioner's criminal trial, the state offered corroborating forensic and testimonial evidence to establish the version of events described in the preceding paragraphs, although no forensic evidence directly implicated the petitioner. Among other things, the state offered the testimony of two eyewitnesses, who heard gunshots, saw a gold colored vehicle in pursuit of someone on foot, saw someone get out of the vehicle, and watched the vehicle circle back to the victim before leaving. The state also offered a videotape and still photographs from security cameras positioned around Travelers Tower near Market Street. These exhibits provided grainy images of a portion of the incident. The state used this photographic evidence to prove, among other things, that the petitioner's vehicle stopped near the victim's final location and that someone emerged from the vehicle to check to see whether the victim was dead.

---

[18] The victim sustained serious, permanent injuries as a result of the incident. Each shotgun shell dispelled hundreds of small pellets, which lodged in the victim's head and body. She lost partial sight in one eye, the use of one of her arms, and the ability to bear children.

Mitchell *v.* State

The petitioner testified at trial and admitted that he was present at the scene. He asserted, however, that he had no knowledge that Hampton was in possession of a gun until Hampton started shooting, that Hampton was the only shooter, and that the victim's perception of the events was impaired by drugs. The petitioner's testimony described a version of events casting Hampton as the lone criminal actor. According to the petitioner, the victim produced and lit up some "dust" (marijuana laced with embalming fluid), which she and Hampton shared in the car. After a stop at the petitioner's mother's house, where the petitioner and the victim had consensual, protected sex[19] on the porch, the two males and the victim left in the car. Hampton then directed the petitioner to take them somewhere so he and the victim could have sex. The victim just sat there "in a daze." Hampton directed the petitioner to stop the car on Market Street, where he and the victim exited the car and went behind a building. When they emerged, the victim, who was holding her pants in hand, attempted to leave on foot rather than get back into the car. Hampton then pursued the victim. The petitioner moved the car near the Citgo station and then dozed off until he was awakened by a loud noise, which he later realized was a gunshot. When he saw that Hampton was firing a gun at the victim, the petitioner attempted to hit Hampton with the car but could not because he encountered a curb. After Hampton got into the car, the petitioner panicked and drove off.

In its closing argument, the state argued that the eyewitness accounts and the photographic evidence proved that the passenger got out of the car and shot

[19] No DNA evidence was recovered from the victim to identify her assailants. There was no semen in the victim's rape kit, but human seminal protein fluid was found on the victim. There was testimony that, if such fluid does not contain sperm, it will not contain DNA. A forensic criminologist testified that the absence of semen on the victim could have resulted from medical personnel cleaning the victim to insert her catheter and breathing tube.

Mitchell *v.* State

the victim and that the driver—the petitioner—got out of the vehicle, looked at the victim lying on the ground, and got back into the car.

The court instructed the jury that, for all of the substantive charges except unlawful possession of a firearm, it could find that the petitioner had committed the crimes as a principal or an accessory, or could find him guilty on the basis of vicarious liability as Hampton's coconspirator under the *Pinkerton* doctrine.[20] The jury found the petitioner guilty of all of the crimes charged. It found him guilty of the kidnapping charge as a principal or accessory and guilty of the assault and sexual assault charges as a coconspirator under *Pinkerton*.[21]

B

"[T]o obtain a new trial on the basis of newly discovered evidence, the petitioner must establish that the newly proffered evidence (1) is actually newly discovered, (2) would be material in a new trial, (3) is not merely cumulative, and (4) would probably produce a different result in a new trial." *Jones* v. *State*, 328 Conn. 84, 92, 177 A.3d 534 (2018), citing *Asherman* v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987). "This strict standard is meant to effectuate the underlying equitable principle that once a judgment is rendered it is to be considered final, and should not be disturbed by posttrial motions except for a compelling reason." (Internal quotation marks omitted.) *Skakel* v. *State*, 295 Conn. 447, 467, 991 A.2d 414 (2010).

---

[20] In *State* v. *Walton*, 227 Conn. 32, 43, 45–46, 630 A.2d 990 (1993), we recognized the principle of vicarious liability that the United States Supreme Court articulated in *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), under which conspirators may be held liable for criminal offenses committed by their coconspirators that are (1) within the scope of the conspiracy, (2) in furtherance of it, and (3) reasonably foreseeable as a necessary or natural consequence of the conspiracy.

[21] The verdict form did not ask the jury to indicate the basis of liability for the attempted murder charge.

Mitchell *v.* State

In his petition for a new trial, the petitioner alleged that there was newly discovered evidence in the form of (1) technological improvements to the security camera videotape that had been shown to the jury, which made clear that, contrary to the state's claim at trial, it was the vehicle's passenger (Hampton), not the driver (the petitioner), who exited the vehicle to approach the victim's body, and (2) significant impeachment evidence bearing on the credibility of Henderson, the lead detective, involving his posttrial arrest for official misconduct in connection with other cases. The petition also alleged as other reasonable cause for a new trial that the prosecutor had engaged in misconduct by not disclosing exculpatory evidence relating to the videotape, criminal charges brought against Henderson, and other matters, and by adducing false testimony from the victim.

In its decision denying the petition for a new trial, the court characterized the evidence against the petitioner as "overwhelming." It also pointed out that the petitioner's efforts to cast Hampton as the sole wrongdoer ignored the obvious and immovable impediment to the petitioner's exculpation under this theory, namely, the fact that the petitioner could have been convicted on the basis of accessorial or *Pinkerton* liability even if he, himself, had not assaulted or shot the victim. The trial court determined that both the videotape and the evidence related to Henderson failed to satisfy the *Asherman* test in multiple respects, and the court emphasized in particular that neither claim met the fourth prong of *Asherman*, as neither would probably produce a different result in a new trial. The court rejected the claims of prosecutorial misconduct on the grounds that the claims were undefined, unsupported by evidence, and/or lacking in merit. It similarly concluded that an issue not raised in the petition for a new trial but pressed at the related evidentiary hearing— purportedly suspicious circumstances surrounding the

Mitchell *v.* State

belated testing of the victim's blood sample that yielded negative results for the presence of drugs—would not affect the verdict.

As a threshold to our review of the merits, the petitioner must establish that the trial court abused its discretion in denying certification to appeal from the court's denial of his new trial petition. "A petitioner satisfies that burden by demonstrating: [1] that the issues are debatable among jurists of reason; [2] that a court could resolve the issues [in a different manner]; or [3] that the questions are adequate to deserve encouragement to proceed further." (Emphasis omitted; internal quotation marks omitted.) *Seebeck* v. *State*, supra, 246 Conn. 534; see id. (relying on framework adopted in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), for analyzing certificate of probable cause to appeal under federal habeas corpus statute for petitions for certification to appeal under § 54-95 (a)).[22]

The petition for certification to appeal framed the issue warranting review broadly: "Whether the trial court erred in denying the petitioner's petition for a new trial."[23] The petitioner's original appellate brief, in

---

[22] The trial court's decision in the present case denying leave to file the late petition did not address *Lozada* explicitly. Nonetheless, the court's determinations that none of the petitioner's claims "ought to be reviewed by a higher court" and that the claims are "meritless" implicitly correspond to a determination that none of the *Lozada* criteria was met. Neither party claims otherwise.

[23] The petition for certification also raised the issue of "[w]hether the trial court erred in failing to admit proffered exhibits into evidence at trial." We do not separately address this issue. The trial court did not address it in its decision concluding that the petitioner had raised no issues that warranted certification, and the petitioner did not request an articulation on this issue. It is not evident from the record that the trial court declined to consider the exhibits at issue or, if it did, the basis for that decision. Ultimately, we are persuaded that none of the exhibits at issue would have likely affected the outcome of the case. We reach this conclusion for essentially the same reasons that have led us to conclude that the trial court did not otherwise abuse its discretion in determining that the petition for a new trial lacked merit.

Mitchell *v.* State

which he challenged the trial court's decision denying
the new trial petition, focused exclusively on whether
each piece of evidence offered in support of his new
trial petition would have affected the verdict. The trial
court's decision denying the petitioner's request for
leave to file the petition for certification to appeal reiter-
ated that court's view that the newly discovered evi-
dence was not sufficiently material to have an effect
on the verdict. We therefore similarly focus our discus-
sion on whether the trial court abused its discretion by
determining, in effect, that no court reasonably could
conclude that the newly produced evidence would prob-
ably produce a different result in a new trial.

"The burden of proving the probability of a different
result is upon the [petitioner], and in determining that
issue the trial court exercises a discretion [that] cannot
be set aside unless its discretionary power has been
abused." *Johnson* v. *State*, 172 Conn. 16, 17, 372 A.2d
138 (1976); cf. *Jones* v. *State*, supra, 328 Conn. 87 (recog-
nizing exception in which de novo review is appropriate
when petition for new trial is decided by judge who did
not preside over original trial and no fact-finding was
necessary because both parties agreed that new evi-
dence was fully credible). The petitioner must over-
come a high hurdle to establish such an abuse of
discretion. "To meet the fourth element of *Asherman*,
[t]he [petitioner] must persuade the court that the new
evidence he submits will *probably*, not merely possibly,
result in a different verdict at a new trial . . . . It is
not sufficient for him to bring in new evidence from
which a jury *could* find him not guilty—it must be evi-
dence [that] persuades the judge that a jury *would* find
him not guilty." (Emphasis in original; internal quota-
tion marks omitted.) *Jones* v. *State*, supra, 93; see also
*Skakel* v. *State*, supra, 295 Conn. 467–68; cf. *Henning*
v. *Commissioner of Correction*, 334 Conn. 1, 24–25,
219 A.3d 334 (2019) (discussing less stringent standard

Mitchell *v.* State

when newly discovered evidence involves knowing pro-
duction of false testimony).

When examining the trial court's conclusion that the
new evidence did not meet this standard, it is important
to recognize that the trial judge, who also had presided
over the petitioner's criminal trial, made an unchal-
lenged determination that the evidence against the peti-
tioner at the criminal trial was overwhelming. The judge
who presided over the petitioner's habeas petition,
although not having the opportunity to assess the credi-
bility of the criminal trial witnesses, likewise character-
ized the state's case as a strong one. Those assessments
presumably took into account the evidence previously
recited, as well as evidence that the petitioner knew
where the shotgun was hidden after the incident (a
location to which both the petitioner and Hampton had
access), evidence of sixty phone calls between the peti-
tioner and Hampton on the day of the incident and the
two days thereafter, and significant evidence demon-
strating consciousness of guilt. The trial court's assess-
ment also finds strong support in its observation that
the petitioner's claim regarding Hampton's primary
responsibility fails to exonerate him due to accessorial/
*Pinkerton* liability.

We have fully reviewed the record. The trial court did
not clearly abuse its discretion in denying certification
to appeal.

1

We begin with the technologically enhanced security
camera videotape, which is indisputably clearer than
the version offered at the criminal trial. That videotape
displays more clearly the direction the vehicle was
heading when it stopped and thereby also makes clearer
that the passenger, and not the driver, emerged from the
vehicle, presumably to approach the critically wounded
victim. This fact is consistent with Henderson's testi-

Mitchell *v.* State

mony at the criminal trial about his observations of the still frames taken from the original videotape shown to the jury. It is inconsistent, however, with the testimony of the victim, as well the testimony of a security guard from a nearby building who had observed the events from a distance, that the petitioner/driver came out of the vehicle.

As the trial court noted in its decision denying the new trial petition, a similar claim regarding this evidence had previously been adjudicated in the habeas proceedings, albeit through the lens of the petitioner's claim of ineffective assistance of counsel. The habeas court's conclusion, upheld on appeal, was that no prejudice resulted from counsel's alleged failure to adequately investigate the videotape evidence to prove that the driver did not exit the vehicle. See *Mitchell* v. *Commissioner of Correction*, supra, 156 Conn. App. 414, 420–21. That conclusion rested on the fact that the videotape and still frames did not capture the entire incident (no security cameras covered the area where the victim claimed that the sexual assaults occurred and the first shot was fired), the videotape and still frames were presented to the jury, and Henderson had testified that the still frames showed the passenger getting out of the car. Id., 409–19. The habeas court also noted the strength of the state's case against the petitioner. Id., 419–20.

To these observations we add that we would not characterize as meaningfully exculpatory the part of the incident that is captured in the enhanced videotape. The enhanced videotape shows that the petitioner brought the vehicle to a stop near the victim to allow Hampton to exit the vehicle, which gave Hampton the opportunity to inflict a fatal gunshot wound if the victim was not already dead or mortally wounded. The fundamental import of the evidence does not change: the petitioner wilfully and actively participated in the rele-

Mitchell *v.* State

vant criminal activity by stopping the vehicle to allow his passenger to ensure that the victim was dead.

We also are not persuaded that the enhanced videotape would have had a significant impeachment effect at trial. See generally *Adams* v. *State*, 259 Conn. 831, 839, 792 A.2d 809 (2002) (''[N]ew trials [typically] are not granted upon newly discovered evidence which discredits a witness unless the evidence is [both] vital to the issues and . . . strong and convincing . . . . The rule restricting the right to a new trial when one is claimed on the basis of newly discovered evidence merely affecting the credibility of a witness is necessary because scarcely has there been an important trial . . . [after which a] diligent search would not have discovered evidence [to impeach] some witness . . . . Without such a rule, there might never be an end to litigation.'' (Citation omitted; internal quotation marks omitted.)). Although the enhanced videotape could be used to impeach the testimony of the victim and the security guard that the driver exited the vehicle, it seems exceedingly unlikely that this discrepancy would have undermined the general credibility of either witness. At the time the victim was approached by whoever exited the vehicle, after all, she not only was suffering from the physical effects of life-threatening shotgun wounds, but also was attempting to observe her assailants' actions without giving away that she was still alive. It is farfetched to think that the jury would have doubted other aspects of her testimony merely because she confused the passenger for the driver as the man who approached her to assess her condition after the shooting. The security guard's misperception of the identity of the person exiting the vehicle, likewise inconsequential, is most probably explained by the fact that the vehicle was stopped in the opposite travel lane, so that the passenger's side of the vehicle would be on the side where the driver normally would be.

Mitchell *v.* State

We are not persuaded that the trial court's findings and conclusions as to the videotape evidence are debatable among jurists of reason, that a court could have resolved this claim in a different manner, or that there are any questions that warrant further proceedings. The trial court did not abuse its discretion in denying certification to appeal with respect to this issue.

2

We next consider the newly discovered evidence of former Detective Henderson's posttrial arrest and conviction. In support of this claim, the petitioner cited *Thomas* v. *State*, 130 Conn. App. 533, 24 A.3d 12, cert. denied, 302 Conn. 945, 30 A.3d 2 (2011), in which the Appellate Court rejected a similar claim that newly discovered evidence of Henderson's arrest and conviction required a new trial in that case. According to *Thomas*, Henderson was arrested in 2006 and charged in a ten count information with larceny in the first degree, forgery in the second degree, fabricating physical evidence, and tampering with a witness.[24] Id., 537. He entered a plea of nolo contendere to one of court of forgery in the second degree. Id. The charges apparently arose from criminal activity dating back to 2000 involving a forgery scheme used by Henderson to obtain money intended to compensate confidential informants. Id., 539.

In the present case, the petitioner raised two claims to explain how he was harmed by the state's failure to disclose evidence of Henderson's illegal conduct. In his petition, he contended that the evidence should have been made available to him for impeachment purposes to attack Henderson's credibility as a witness. At trial

[24] The records offered as exhibits in support of the petition for a new trial in the present case indicate that Henderson was charged only with larceny and forgery. Nothing in the record explains the discrepancy between this exhibit and the facts recited in *Thomas* v. *State*, supra, 130 Conn. App. 537.

Mitchell *v.* State

on the petition, he contended that the evidence supported his theory that Henderson had obtained a second blood sample from the victim, which was used to produce the negative toxicology test.

The trial court agreed that this evidence could have been used at the petitioner's criminal trial to impeach Henderson's credibility but concluded that it was not probable that a different result would occur if this evidence was available.[25] The court noted that Henderson had undertaken all but two activities relating to the petitioner's case in the presence of others and that neither of those two activities had proved to play a material part in the petitioner's conviction. It further concluded that, because the petitioner's coconspirator, Hampton, was convicted at a trial that occurred after Henderson's crimes were made known, through the testimony of a different detective, it was all but certain that a similar substitution and result would occur in the petitioner's new trial. The trial court's disposition of the petitioner's claim as to the general impeachment effect of this evidence plainly was not an abuse of discretion.

The petitioner's other theory as to the potential effect of evidence of Henderson's arrest, relating to the detective's role involving the blood samples, requires some explanation. A blood sample was taken from the victim in 2003 as part of her rape kit. The kit was sealed and placed in evidence with the Hartford Police Department; no toxicology test was run at that time. In 2005, after the petitioner's criminal trial counsel sought a court order to direct the state forensic laboratory to

[25] Although Henderson's official misconduct occurred before the petitioner's criminal trial, the internal affairs investigation into Henderson's conduct did not commence until several months after the petitioner's criminal trial had concluded. The trial court made no finding as to whether there was some basis on which this evidence could have been disclosed to the petitioner during his trial.

Mitchell *v.* State

perform a toxicology test on the blood sample, the victim signed a "Consent for Toxicology Screen." At the hearing on the request, the state's attorney acknowledged that the blood sample "probably ha[d] not been refrigerated" and "may not [have been] viable for testing purposes." After the court issued the order, defense counsel wrote to Henderson asking him to deliver the blood sample in the rape kit to the laboratory. The following day, Henderson signed the rape kit out of evidence. Forms from the forensic laboratory reflect that the laboratory received two vials of blood. The toxicology test detected no drugs or metabolites.

From these facts, the petitioner hypothesizes that the evidence of Henderson's criminal activity, if made known to the jury, could have resulted in a different outcome because it would have supported the petitioner's theory that the victim's perception was impaired from smoking "dust." To reach this conclusion, the petitioner relies on the following suppositions: (1) the 2003 blood sample was not viable for testing due to a lack of refrigeration, (2) had the sample been viable, it would have tested positive for the presence of the drugs, (3) the 2005 consent form was executed to obtain a *second blood sample* to ensure that the toxicology test would not detect drugs in the victim's blood, and (4) because Henderson delivered the two vials of blood to the laboratory and had been charged with (but not convicted of) fabricating evidence in an unrelated case, he had switched the 2005 blood sample for the 2003 sample.[26] We are not persuaded.

_____

[26] This theory stemmed in part from a statement made by the victim to the emergency medical technician who reported to the scene to transport her to the hospital that she had been "dragged, drugged, and raped." The petitioner's toxicology expert and the emergency medical technician opined that certain conduct by the victim was consistent with the effects of smoking "dust" but also was consistent with the effects of trauma from excessive blood loss.

There are many reasons why the evidence regarding Henderson's arrest does not give rise to a reasonable probability of a different verdict on the basis of this theory. Two stand out. First, the trial court found that the record demonstrated that the sample that was tested was the same one that was part of the rape kit, and the petitioner has not pointed to anything in the record that indicates otherwise. Contrary to the petitioner's view, the state's attorney's casual reference at the court hearing to a singular "vial" of blood is not evidence that misconduct was afoot when two vials were delivered to the laboratory. Nor does the mere fact that the "Consent for Toxicology Screen" form executed by the victim authorized "the collection . . . of blood samples" for the purpose of detecting the presence of drugs; the form's plural phrasing does not in any way tend to prove that the state used that consent to obtain a second sample. Second, there was compelling evidence from which the jury probably would have concluded that the victim's drug use, even if it had occurred, did not materially impair her perception. The victim admitted that she had no idea whether the marijuana given to her by the petitioner could have contained "dust" but also testified that she had not noticed any difference in how she felt after smoking the joint. When police officers arrived on the scene shortly after the incident, the victim provided them with the accurate color, make, and model of the petitioner's vehicle, accurate information that it was a rental car, and accurate information about the direction in which the vehicle left the scene. The emergency department physician who treated the victim upon her admission declined to order a toxicology test because the physician saw no clinical evidence that the victim was under the influence of drugs. The physician testified that the victim appeared alert and oriented, and the physician confirmed that impression

Mitchell *v.* State

through testing.[27] The victim told two physicians at the hospital that she knew the person who had inflicted her injuries, and she specifically identified the petitioner as the perpetrator to the police as soon as her breathing tube was removed following surgery.

Under these circumstances, the trial court did not abuse its discretion in effectively concluding that no court would conclude that evidence of Henderson's arrest and conviction probably would yield a different result in a new trial.

3

The petitioner also sought a new trial on the ground that the state withheld exculpatory evidence (i.e., a *Brady*[28] violation) and introduced false testimony from the victim. See *State* v. *McCoy*, 331 Conn. 561, 598, 206 A.3d 725 (2019) ("newly discovered *Brady* claims may . . . be brought by way of a petition for a new trial"); see also *In re Jonathan M.*, 255 Conn. 208, 239, 764 A.2d 739 (2001) ("[t]he causes for which new trials may be granted . . . are only such as show that the parties did not have a fair and full hearing at the first trial; and the words or for other reasonable cause, mean other causes of the same general character" (internal quotation marks omitted)). Specifically, the petitioner contended that the prosecution suppressed (1) selective portions of videotape and photographic evidence that would have been inconsistent with the victim's version

---

[27] The victim received the highest possible scores on all three parts of the Glasgow Coma Scale, an objective test that assessed her motor skills and verbal abilities, including whether the victim knew what was going on and where she was, and whether she could answer questions correctly and appropriately. The emergency department physician who administered the test also testified: "I didn't feel there was any alteration in her thinking or mental status at all. I didn't feel there was any clinical evidence that she was under the influence of any drugs . . . and didn't feel the necessity to do [a toxicology test] at that time."

[28] Brady v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

Mitchell *v.* State

of events, (2) materials produced by Angelsea Critical Evidence, the company hired by the state to assess the security camera video and still frames and to produce viewable copies, (3) Henderson's malfeasances that were occurring concurrently with his investigation of the petitioner, (4) evidence relevant to whether a second blood sample was taken, and (5) the dismissal of charges pending against the victim in consideration for her testimony. The petitioner also contended that the prosecution presented false testimony from the victim regarding the petitioner's actions on Market Street.

To prevail on a *Brady* claim, the petitioner must show that the evidence at issue was material, in the sense that there is a reasonable probability that the result would have been different had the evidence been disclosed.[29] See *Demers* v. *State*, 209 Conn. 143, 150, 161, 547 A.2d 28 (1988). "[A] conviction obtained by the knowing use of perjured testimony . . . must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." (Internal quotation marks omitted.) *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 25.

In its decision denying the new trial petition, the trial court concluded that all of the petitioner's prosecutorial impropriety claims failed because there was no evidence or no newly discovered evidence that would be material. With regard to the claims relating to the security camera footage, the court found that the prosecution had provided the defense with a viewable copy of

_____

[29] "[A] trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error. . . . Because the trial judge had the opportunity, however, to observe firsthand the proceedings at trial, including the [examination of witnesses], our independent review nevertheless . . . giv[es] great weight to the trial judge's conclusion as to the effect of nondisclosure on the outcome of the trial . . . ." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 720–22, 911 A.2d 1055 (2006).

Mitchell *v.* State

the videotape, albeit belatedly, and the defense did not request a continuance to investigate it further. With regard to Henderson's misconduct, the court rejected the admissibility and materiality of evidence proffered by the petitioner to show that Henderson had been arrested in Massachusetts on domestic violence charges. With regard to the dismissal of charges against the victim, the court found that there was no evidence to support the petitioner's contention that the victim had received inducements to testify. It noted that the state had entered nolles on a domestic violence charge and a motor vehicle charge against the victim in November, 2003, before preparations for the petitioner's criminal trial began.

We conclude that the trial court did not abuse its discretion in concluding that none of the petitioner's prosecutorial impropriety claims warrants appellate review. There is nothing in the record to suggest that the trial court's findings and conclusions are debatable among jurists of reason, that a court could have resolved this claim in a different manner, or that there are any questions that deserve further proceedings. In addition to the findings and conclusions of the trial court, our previous discussion explains why most of the evidence at issue would not likely result in a verdict of not guilty. We also add, with respect to the nolles of charges against the victim, that it is undisputed that the victim identified the petitioner as one of her assailants shortly after she came out of surgery, well before there could have been any purported inducement to testify. See *State* v. *Ouellette*, 295 Conn. 173, 186–87, 989 A.2d 1048 (2010) (noting that whether defendant established necessary factual predicate to his claim that state's attorney did, in fact, promise to dismiss charges against witness as part of plea agreement "is a fact based claim to be determined by the trial court, subject only to review for clear error").

The trial court did not abuse its discretion in concluding that certification to appeal should be denied. Although we disagree with the Appellate Court's rationale for dismissing the petitioner's appeal, its decision may be affirmed on this alternative basis.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.